HAGEN ADVERTISING DISPLAYS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 474–64. Filed November 18, 1966.

140

*K. G. Seitz*, for the petitioner.
*Richard M. Schwartz*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's income tax for the calendar years 1960 and 1962, in the amounts of $25,033.04 and $16,119.60, respectively.

The issue for decision is whether amounts paid to petitioner by certain of its customers for products ordered from petitioner which were to be delivered by petitioner at a later date were properly excluded from taxable income by petitioner in each of the years here involved to the extent that the products ordered with respect to which the payments were made had not been shipped at the close of the taxable year.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner was incorporated on January 2, 1948, under the laws of Ohio. Its principal office is in Cincinnati, Ohio. For the taxable years 1960 and 1962 petitioner filed its Federal income tax returns with the district director of internal revenue at Cincinnati, Ohio. It keeps its books and reports its income on an accrual basis.

Petitioner is and has been since its incorporation engaged in the business of manufacturing dealer identification signs for national advertisers including, among others, General Tire & Rubber Co., Goodyear Tire & Rubber Co., Hiram Walker, Republic Steel Corp., Toro Manufacturing Co., Armco Steel Corp., and Cooper Tire & Rubber Co.

The national advertisers, who are petitioner's customers, are continuously establishing new dealerships for which illuminated plastic identification signs are required. Such customers attempt to forecast their need for signs a year in advance, and then place a so-called blanket order with petitioner for the number of signs which this estimate shows will be needed for the ensuing year. Thereafter, as the new dealerships are opened, the customer directs petitioner to deliver a sign to such dealerships and petitioner ships against the blanket order until the total number of signs contracted for in the blanket order have been shipped. Although a blanket order normally represents a customer's budgeted needs for 1 year, on some occasions the budget

estimates are inaccurate or blanket orders are placed for more than 1 year. In such instances petitioner's shipments under a blanket order will extend over a period longer than 1 year from the date of receipt of the blanket order. Some of the blanket orders received during the years here in issue remained outstanding (i.e., not all of the signs ordered were yet delivered) for as long as 2 or 3 years from the date of receipt.

Petitioner from 1955 through 1960 entered into sales contracts with its various customers created by the receipt of a purchase order based on a quotation to the customer by petitioner in response to the customer's inquiry. The quotation by petitioner set forth the terms and conditions for the manufacture of the signs as well as the specifications for the sign, method of delivery, and the earliest delivery date to be required under the order. Upon receipt of a purchase order petitioner begins the process of manufacturing the signs described in the order. Normally, it takes about 4 weeks before petitioner is in a position to start shipping signs. No signs are shipped until petitioner receives instructions, or a "release," from the customer specifying the dealer to whom the sign is to be shipped. Releases are received intermittently, on a sign-by-sign basis as the customer's needs arise.

The degree to which a sign may be completed by petitioner prior to receipt of a shipping release depends on the character of the sign. Certain indoor signs may be fully completed and held in stock ready for immediate shipment. Other signs, such as those which require the imprint of an individual dealer's name are held in stock partially completed and then completed and delivered usually within 10 days after receipt of a release with specific instructions. If a release calls for a special internal construction, completion and delivery are made within 2 weeks of the release. The signs are constructed strictly in accordance with the customer's desires and specifications. The customer's order controls the size, material, shape, design, lettering, and illustration. However, petitioner keeps some stock parts which it uses in some of the signs it manufactures. Once the customer's name is imprinted on the face of a completed sign, such sign is not salable to any customer other than the one who ordered it. In most instances and normally a sign to be manufactured under a blanket order is not completed or ready for shipment prior to receipt of the customer's release for that sign.

The terms of the above-described blanket order provide for payment by the customer for each sign, individually, upon delivery by petitioner after receipt of a release from the customer. The customer is billed for each sign within a day or two after it is shipped. Petitioner's quotation of price forms specify "F.O.B. our plant, Cincinnati, Ohio terms are net 30 days." With the limited exceptions mentioned

below, there is no requirement, condition, or understanding, written or oral, that the customer will pay for any signs prior to release and shipment. Normally, petitioner's customers do not make advance payments. However, some payments are received prior to delivery, under one of two types of circumstances:

(1) When a blanket order has been outstanding for an extended period of time (usually 12 months) and some of the signs ordered have not yet been "released" by the customer, the petitioner may, upon the judgment of its president, bill the customer for the remaining undelivered signs prior to release in order to induce the customer to order them out (i.e., "release" them), or to receive payment prior to shipment if the signs are not released by a customer. Such advance billings are infrequent and are made only when petitioner's management considers it appropriate. Accounts billed in these circumstances are referred to as "slow-movers."

(2) Some of petitioner's customers request, as a matter of their own preference and at their own initiative, to be billed for all or a portion of their blanket order prior to delivery.

Receipts from these two types of advance billings were recorded in an account designated as "advances from customers." This account was recorded on petitioner's books as a liability and was included among liabilities on its financial statements and tax returns. Until sometime in 1961 petitioner deposited the amounts of advance payments in a separate bank account from that used for deposit of other receipts. In 1961 this bank account was closed out and the advance payments were deposited in the same bank account with petitioner's other receipts. No restrictions were placed upon petitioner's use of the money received from these predelivery billings, and, in fact, this money was used for current operating expenses and general corporate purposes. When petitioner delivered a sign upon the instructions of a customer who had been previously billed and had paid for his order in advance, petitioner merely issued a memorandum billing for the customer's records, showing the balance of undelivered signs. Petitioner also used the memorandum billing in its own records as the basis for an entry removing the amount billed from the "advances from customers" account and recording it in the sales account.

In determining its income as reported on its Federal income tax returns petitioner computes its cost of goods sold by the use of opening and closing inventories. The amount of the opening inventory is added to the amount of merchandise bought for manufacture or sale plus salaries and wages plus other costs, and the amount of the closing inventory is subtracted from this total. Petitioner's yearend inventories include completed and partially completed signs. In preparing the yearend inventories petitioner has a complete floor count of all ma-

terial. For completed signs and material in process petitioner adds to the material costs the labor involved and its normal overhead percentage on such labor. Petitioner's opening inventory for the year 1960 amounted to $80,330 and its closing inventory totals for the years 1960, 1961, and 1962 were, respectively, $76,493, $80,197, and $106,107. Approximately 80 percent of annual yearend inventory consists of materials and costs related to signs already on order. Petitioner's accounting records for the years in issue did not allocate costs between the production of signs for customers who had made advance payments as distinguished from signs made for other customers. Thus, the portion of annual ending inventories (of work in process and finished signs) which represented inventory of signs for which payment had already been received is not determinable. Petitioner did not know and had no accurate way of ascertaining at the end of December 1960 and 1962 what the cost of signs to be manufactured and delivered in subsequent years would be.

Petitioner's yearend balance in the advances from customers' account for the years 1955 through 1962 was as follows:

| | | | | |
|---|---|---|---|---|
| 1955 | $20,493 | | 1959 | $41,830 |
| 1956 | 16,832 | | 1960 | 48,749 |
| 1957 | 8,270 | | 1961 | 43,160 |
| 1958 | 3,741 | | 1962 | 74,040 |

Of the balance of $74,040 as of December 31, 1962, $11,055 represented advance payments on billings initiated by the petitioner on so-called slow-mover accounts. The remainder, in the amount of $62,985, represented advance payments made voluntarily on billings initiated at the customer's request.

Advance payments included in the advances from customer's account as of the end of any given year were removed from that account and credited to sales in the subsequent year, or years, in which petitioner delivered the signs for which the advances had been paid. Thus, petitioner recognized sales income only in the year of delivery. Some of the signs for which advance payment was received were not shipped (and not recorded as sales) until 1, 2, or even 3 years after receipt of the advance payment.

For the taxable year 1960 petitioner received advances of $48,749 which were not reported as income in its 1960 return but instead were included in income in a subsequent year or years in which the signs were delivered. For the taxable year 1962 petitioner received advances of $74,040 which were not reported as income on its 1962 return but instead were included in income in a subsequent year or years in which the signs were delivered. Included in sales income reported on petitioner's 1962 return was $43,160 attributable to signs delivered in 1962 but for which advance payments had been received in years prior to 1962.

The parties have stipulated as follows with respect to customers' advances to petitioner in 1960 and 1962:

For the taxable year ended December 31, 1960, petitioner received customers' advances in the amount of $77,989.00. Petitioner reported on its 1960 return advances in the amount of $71,070.00. Of this latter amount, $41,830.00 was received prior to 1960 and $29,240.00 was received during 1960. Petitioner received advances of $48,749.00 ($77,989.00 less $29,240.00) in 1960 which were not reported as income on its 1960 return but instead were included in income in a subsequent year in which the signs were delivered.

For the taxable year ended December 31, 1962, petitioner received customers' advances in the amount of $88,347.00. Petitioner reported on its 1962 return advances in the amount of $57,467.00. Of this latter amount, $43,160.00 was received prior to 1962 and $14,307.00 was received during 1962. Petitioner received advances of $74,040.00 ($88,347.00 less $14,307.00) in 1962 which were not reported as income on its 1962 return, but instead were included in income in a subsequent year in which the signs were delivered. If respondent's theory of the case is sustained and $74,040.00 is includable in petitioner's income for the taxable year ended December 31, 1962, such amount should be reduced by $43,160.00, an amount improperly included in petitioner's income for 1962. The net effect of these adjustments is to increase petitioner's income for 1962 in the amount of $30,880.00, the amount set forth in the statutory notice as an adjustment to income for the taxable year ended December 31, 1962.

Petitioner reported gross receipts from the sale of signs (exclusive of advance payments for signs not shipped in the taxable year and inclusive of advance payments not previously reported for signs shipped that year) and cost of goods sold determined by use of opening and closing inventories as follows:

| FYE Dec. 31— | Gross receipts | Cost of goods sold |
| --- | --- | --- |
| 1960 | $531,049 | $328,387 |
| 1962 | 557,873 | 370,855 |

Respondent in his notice of deficiency determined that petitioner's income for the calendar years 1960 and 1962 should be increased by $48,749 and $30,880, respectively, "the amount of prepaid customer deposits received during the year." In explanation he stated:

The customer deposits are unrestricted as to use, and represent income to the corporation in the year received, in accordance with section 61(a) of the Internal Revenue Code of 1954.

For the year 1960 respondent computed the amount of the deficiency by recomputing the tax for each of the years 1958, 1959, and 1960 by including in income one-third of the $48,749 of customer deposits at December 31, 1960. He described the deficiency so determined as "Statutory Deficiency per Sec. 481(b)(1)." Respondent determined an overassessment in petitioner's income tax for the calendar year 1961 because of exclusion from 1961 income of amounts included therein by petitioner which respondent had included in "customer deposits" in computing petitioner's 1960 income. Respondent in his notice of de-

ficiency made no adjustment to the cost of goods sold as reported by petitioner for any year and made no adjustment to the amount of inventory as reported by petitioner in any year.

Petitioner takes the position that the prepayments which it received in each of the years here in issue did not constitute income to it at the time of receipt under the provisions of section 61(a) of the Internal Revenue Code of 1954.[1] It is petitioner's position that since it is an accrual basis taxpayer, it realizes income when a sale is completed and the right to payment becomes unqualified which petitioner states is when title to or possession of the property has passed from it to its customer.

Petitioner states that the advance payments may constitute gross receipts, but there can be no gross income until the cost of goods sold has been determined and deducted from gross receipts. Petitioner relies upon *Veenstra & DeHaan Coal Co.*, 11 T.C. 964 (1948); *Woodlawn Park Cemetery Co.*, 16 T.C. 1067 (1951); *Watkins* v. *United States*, 287 F. 2d 932 (C.A. 1, 1961); and *Consolidated-Hammer Dry Plate & Film Company* v. *Commissioner*, 317 F. 2d 829 (C.A. 7, 1963), reversing in part a Memorandum Opinion of this Court, as supporting its position. Petitioner contends that these cases which deal with contracts to sell property are distinguishable because of this fact from the cases dealing with contracts primarily for the rendition of personal services which hold advance payments to be includable in gross income in the year of receipt. See *Schlude* v. *Commissioner*, 372 U.S. 128 (1963), and *American Automobile Assn.* v. *United States*, 367 U.S. 687 (1961).

It is fundamental that not all receipts of money or property by a taxpayer constitutes a part of his gross or taxable income. Two examples of receipts which are not income are money borrowed by a taxpayer, which the circuit court in *Consolidated-Hammer Dry Plate & Film Company* v. *Commissioner, supra*, considered the advances there at issue to be, and deposits so restricted as to use by the recipient as to cause them in effect to be loans, as was held to be the substance of the transactions in the other cases relied on by petitioner. Other examples of receipts which are not income are those from a repayment to a taxpayer of money previously loaned to another, or an amount received from the sale of a specifically identifiable item of property at no more than the taxpayer's basis therein so that the amount received represents entirely a return to the taxpayer of capital investment.

The instant case is distinguishable on its facts from the cases relied on by petitioner involving mere loans or restricted deposits. The

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

advance payments received by petitioner from its customers were without restriction as to use or disposition and were in fact used by petitioner in its normal business operations. The parties stipulated that no restrictions were placed on the use of the customer's advances received by petitioner in the years here in issue. These amounts were received by petitioner from customers from whom it had firm orders for signs for which the payments were made. In many instances petitioner had begun, and in some instances had completed, the manufacture of those signs in accordance with the specifications of the customer. Insofar as this record shows, under no circumstances would petitioner be required to return any portion of the advance payments, but would, in accordance with its contract, be required to deliver the signs called for by the contract upon the customer's direction that this be done.

The record is clear that the advance payments were for sales in the ordinary course of petitioner's business. As such, these payments are a part of petitioner's "total sales" from which is to be subtracted its "cost of goods sold" to determine its gross income [2] for the year in which the amounts are properly includable under petitioner's accrual method of accounting. It is petitioner's position that even though these amounts have been paid to it, unrestricted as to use, they are not properly to be accrued until the goods for which the payments are made are delivered and the sale thereby completed.

In *Automobile Club of New York, Inc.*, 32 T.C. 906, 912–913 (1959), affd. 304 F. 2d 781 (C.A. 2, 1962), we answered a similar argument with the following statement:

> Under accrual accounting, a taxpayer may be required to accrue an item prior to actual receipt if the right thereto has become unqualifiedly established. But where there is actual receipt and the funds are at the unrestricted disposal of the taxpayer, as is the case here, all the events have already occurred that call for accrual. It has not been the practice in tax accounting to enter upon a further inquiry as to whether the income has been "earned" in order to defer the reporting of such income to a later year. * * *

Petitioner argues that the principle of accrual of income upon its receipt by a taxpayer without restriction as to use is not applicable when the receipt is for goods yet to be delivered. Petitioner states that such a receipt, as in the case of a sale of a particular piece of property for no more than the taxpayer's basis therein, does not give rise to gross income since until the goods are delivered, no gain arises. Petitioner would in effect place its regular business on a "transactional" basis insofar as advance payments are concerned instead of on the annual basis required in tax accounting. See *Automobile Club of New York, Inc., supra* at 914.

---

[2] Sec. 1.61–3(a)    [Income Tax Regs.]

*In general.* In a manufacturing, merchandising, or mining business "gross income" means the total sales, less the cost of goods sold, * * * The cost of goods sold should be determined in accordance with the method of accounting consistently used by the taxpayer.

The same regulation defining "gross income" in a manufacturing business (sec. 1.61-3(a), *supra* fn. 2) on which petitioner relies in arguing that receipts from sales are not "gross income" since cost of goods sold must be subtracted therefrom to arrive at "gross income" provides that "The cost of goods sold should be determined in accordance with the method of accounting consistently used by the taxpayer." Nothing in this regulation suggests that an attempt must be made to match a particular purchase with a particular sale or a particular item in inventory. In fact in the case of this petitioner, no attempt is made to keep records in such a manner, and insofar as the record shows petitioner would be unable from its records to determine the precise cost or amount of gain realized from the sale of any particular sign. Petitioner makes no argument that either its cost of goods sold or inventories are incorrectly computed, and respondent has made no change in either amount as reported by petitioner for either year here in issue.

Section 471 of the Code and section 1.471-1 of the Commissioner's regulations [3] deal with what items are generally included in inventory. These regulations provide for inclusion in inventory only of items to which title is vested in the taxpayer whose inventory is being determined.

Whether petitioner, upon receipt of advance payments, could have completed to such an extent and so set apart signs for which the advance payments were made as to have those signs become the property of the customer, is not an issue here. Petitioner, as the facts show, did not do this, and did not not know what portion of the closing inventory consisted in each year of signs for which advance payments had been received as distinguished from signs ordered by other customers who had not made advance payments.

In *Chester Farrara*, 44 T.C. 189 (1965), we held that the fact that advance payments were for goods to be delivered in the future as distinguished from services to be performed in a subsequent year did not cause the theory underlying the *American Automobile Assn.* and *Schlude* cases to be inapplicable. In our opinion in *Chester Farrara*, *supra*, we, as the Supreme Court did in *American Automobile Assn.* v. *United States*, *supra*, discussed the fact that the Internal Revenue Code of 1954 had included provisions which would have permitted

---

[3] Sec. 1.471-1 [Income Tax Regs.] Need for inventories.

In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. The inventory should include all finished or partly finished goods and, in the case of raw materials and supplies, only those which have been acquired for sale or which will physically become a part of merchandise intended for sale, * * * Merchandise should be included in the inventory only if title thereto is vested in the taxpayer. Accordingly, the seller should include in his inventory goods under contract for sale but not yet segregated and applied to the contract * * * but should exclude from inventory goods sold * * * title to which has passed to the purchaser. * * *

deferral of prepaid income where the amounts were received in connection with an obligation to render services or to furnish goods or other property after the close of the taxable year in which the payments were received, but that those provisions had been repealed retroactively. In *Chester Farrara, supra,* we pointed out that in the legislative history dealing with the enactment of section 452 (S. Rept. No. 1622, 83d Cong., 2d Sess., p. 301), reference was made to existing law requiring the inclusion of items in gross income by a recipient not later than the time of receipt if the amounts so paid were subject to free and unrestricted use by the taxpayer even though the payments were for "goods or services" to be provided by the taxpayer at a future time. See also *Fifth and York Co.* v. *United States,* 234 F. Supp. 421 (W.D. Ky. 1964), from which we quoted in *Chester Farrara, supra.*

Petitioner's final contention is that respondent's determination should not be approved because section 446 permits respondent to change an accounting method used by a taxpayer only where such method does not clearly reflect the taxpayer's income. Petitioner contends that its accounting method under which the advance payments are not included in its income until the merchandise for which the payments were made was shipped to the customer does clearly reflect its income and therefore respondent is not justified in changing its long-standing accounting method.

Section 446 provides that taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income and keeps his books, but if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as in the opinion of the Commissioner does clearly reflect income. Section 1.446–1(a)(2), Income Tax Regs., provides that "no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income." In numerous cases it has been held that section 446, as did its predecessor, section 41 of the Internal Revenue Code of 1939, vests the Commissioner with broad latitude in approving a taxpayer's accounting method, and the Court should not disapprove of the Commissioner's exercise of the discretion granted to him except where his action has been unsound. *Schlude* v. *Commissioner, supra; Automobile Club of Michigan* v. *Commissioner,* 353 U.S. 180 (1957); *Brown* v. *Helvering,* 291 U.S. 193 (1934); and *Automobile Club of New York, Inc., supra.* See also *Simplified Tax Records, Inc.,* 41 T.C. 75 (1963). In view of the many cases sustaining the Commissioner in requiring an accrual basis taxpayer to include amounts in income no later than the time the payment thereof is received, we cannot say that the Commissioner's exercise of his discretion to require petitioner to include such amounts in its income in the years here in issue is unsound. We therefore

sustain respondent in his inclusion in petitioner's taxable income of the advance payments received in each of the years here involved.

Petitioner makes no argument in the body of its brief or reply brief to the effect that any reduction of its income as reported is necessitated by the inclusion of the unreported advance payments in its income for 1960 and 1962. In its reply brief petitioner, under the heading, "Conclusion," states:

> In the alternative, if the theory of the Commissioner be sustained, that this Court in redetermining the taxable incomes, should hold, pursuant to the stipulated facts, that in 1960 petitioner over-reported $41,830 received in a prior year, and in 1962 over-reported $43,160 received in a prior year.

As set forth in our Findings of Fact, respondent in 1961 (not in issue here) and 1962 did exclude from petitioner's reported income the amounts of the advance payments received in a prior year by petitioner and included by respondent in petitioner's income for such prior year. The evidence shows that as of December 31, 1959, petitioner was carrying an advance payments account of $41,830 which it reported in its 1960 income. The evidence also shows that respondent in his determination did not eliminate this amount from petitioner's income as reported. It is apparent that if this amount were eliminated from petitioner's 1960 income as reported, the amount would escape tax in any year. Prior to the enactment of section 481,[4] which was a new provision in the Internal Revenue Code of 1954, there would be argument available to petitioner that since the change here was made by respondent, petitioner was entitled to eliminate the $41,830 of prior year's advance payments from 1960 income even though the amount would thereby completely escape tax.

---

[4] SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING.

(a) GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

(b) LIMITATION ON TAX WHERE ADJUSTMENTS ARE SUBSTANTIAL.—

(1) THREE YEAR ALLOCATION.—If—

(A) the method of accounting from which the change is made was used by the taxpayer in computing his taxable income for the 2 taxable years preceding the year of the change, and

(B) the increase in taxable income for the year of the change results solely by reason of the adjustments required by subsection (a)(2), other than the amount of each adjustments to which paragraph (4) or (5) applies, exceeds $3,000.

then the tax under this chapter attributable to such increase in taxable income shall not be greater than the aggregate increase in the taxes under this chapter (or under the corresponding provisions of prior revenue laws) which would result if one-third of such increase in taxable income were included in taxable income for the year of the change and one-third of such increase were included for each of the 2 preceding taxable years.

Under the provisions of section 481(a) (1) and (2), if the Commissioner requires a taxpayer to use an accounting method different from that used in a preceding year, there shall be taken into account those adjustments necessary solely by reason of the change to prevent amounts from being duplicated or omitted, except no adjustments are to be made for a year to which section 481 of the Code is inapplicable.

Petitioner has made no showing here that any portion of the $41,830 in its advance payments account as of December 31, 1959, relates to a year to which the Internal Revenue Code of 1954 is inapplicable. On its face, section 481(a) (1) and (2), as well as section 481(b) (1), under which respondent computed petitioner's income tax for 1960, appears to apply to the facts herein. In *E. Morris Cox*, 43 T.C. 448 (1965), we held that the provisions of section 481(a) (1) and (2) were not applicable to the corporation, the income tax of which was in issue, since the change was made in the first taxable year of the corporation so that the "taxpayer" there involved had not had a different method of accounting in a "preceding year." In *E. Morris Cox, supra*, we therefore permitted the exclusion from the corporate income of some advance payments made in a prior year to a partnership and reported by the corporation in the later year. The facts here differ in this respect from those in *E. Morris Cox, supra*. The petitioner corporation in the instant case had received advance payments which it had not reported as income in the year of receipt but had included in some later year since at least 1955. The change here made by the Commissioner, if it is considered to be a change in petitioner's "accounting method," was a change from the method used by this taxpayer in a preceding year.

Petitioner has shown no facts nor made any argument here or any statement, except as quoted from its conclusion, with respect to the application of section 481. There are no facts in the record here tending to show that respondent has incorrectly applied section 481. We therefore hold that no adjustments other than those made by respondent, are required to be made in petitioner's income in either of the years here in issue.

Reviewed by the Court.

*Decision will be entered for respondent.*

FORRESTER, J., dissents.

---

WITHEY, J., concurring: I concur in both the reasoning and conclusion of the majority opinion but would add that the findings here indicate rather conclusively that whatever costs of manufacture of signs already paid for existed, petitioner still at the end of the annual taxable period owned the benefits thereof because such signs either

completely or partially built remained in its inventory at that time and it therefore had no cost of goods sold with respect thereto which constituted an offset against receipts.

———

HOYT, J., dissenting: I cannot agree with the majority opinion and wish to record my dissent. The evidence here convinces me that respondent's determination exceeds permissible limits because it taxes gross receipts rather than the gain from the sale of goods, which gain alone is income subject to taxation. I would also hold that the petitioner's method of accounting clearly reflected its net income for the years 1960 and 1962 whereas the respondent's determination is erroneous, arbitrary, and clearly distorts income.

Petitioner computes its cost of goods sold according to elementary accounting principles. That is, it starts with its inventory (of raw materials, work in process, and finished goods) at the beginning of the year, adds to this its cost of material, labor, and overhead for the year, and subtracts its inventory at the end of the year. The ending inventory includes all goods on hand to which the taxpayer holds title, including goods (either completed or partially completed), produced for specific customer orders, which have not yet been delivered. This is not only in accordance with good accounting methods but also with the Internal Revenue Code and regulations. The rules for inventory accounting are prescribed in section 1.471–1, Income Tax Regs.:

> In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. The inventory should include all finished or partly finished goods * * * Merchandise shall be included in the inventory only if title thereto is vested in the taxpayer. Accordingly, *the seller should include in his inventory goods under contract for sale but not yet segregated and applied to the contract * * * but should exclude from inventory goods sold * * * title to which has passed to the purchaser.* [Emphasis added.]

Under the respondent's regulations petitioner is *required* to include in yearend inventory the signs which it has produced (or is in the process of producing) under specific contract but which have not yet been delivered, or to which title has not yet been transferred.[1]

The inclusion of these goods in yearend inventory means that their cost is excluded (or removed) from the cost of goods sold for the year, for as already explained above, cost of goods sold equals beginning inventory, plus manufacturing costs *minus* ending inventory. Thus, the respondent's adjustments as upheld by the majority in this case

[1] Normally, title to goods, the subject of a contract of sale, passes upon delivery of the goods. Uniform Commercial Code sec. 2–401(2) ; Uniform Sales Act sec. 19 ; Ohio Rev. Code sec. 1302.42(B) ; Ohio Rev. Code sec. 1315.18–1315.21 (prior to July 1, 1962) ; Ohio Rev. Code Ann. tit. 13, 67n. 22 (Page 1962).

would include in income advance payments received for goods which have not yet been delivered and which, therefore, must be inventoried at yearend and thereby excluded from cost of goods sold for the year. The net effect is to tax gross receipts from these sales without reduction by any cost of those very goods sold.

Although respondent's deficiency notice mentioned only section 61(a) of the Internal Revenue Code of 1954 [2] as his authority for the adjustments made in this case, on brief he relies only on section 446(b). Respondent maintains that petitioner's method of deferring prepaid sales receipts until year of delivery when cost and gain can be determined does not clearly reflect income. He says that the only question presented is whether he clearly abused his discretion in rejecting petitioner's method of accounting for advance payments. He persists in this approach in spite of petitioner's reliance on more fundamental arguments, section 61 and the applicable regulations thereunder.

Section 446 provides in pertinent part as follows:

SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

The regulations under section 446 indicate that it is perfectly proper for a manufacturing business to defer the recognition of sales income until the time of delivery of the goods. Section 1.446–1(c)(ii) of the regulations provides in part as follows:

The method used by the taxpayer in determining when income is to be accounted for will be acceptable if it accords with generally recognized and accepted income tax accounting principles and is consistently used by the taxpayer from year to year. For example, a taxpayer engaged in a manufacturing business may account for sales of his product when the goods are shipped, when the product is delivered or accepted, or when title to the goods passes to the customer, whether or not billed, depending upon the method regularly employed in keeping his books. * * *

Although petitioner has apparently complied with both the statutory and regulatory requirements in accounting for advance payments for the sale of its products, as will be hereinafter discussed, I would hold for the petitioner on the more fundamental question presented here. Section 446 and the regulation quoted deal only with methods of accounting. Our first concern here, however, is not merely with a method of accounting but with the very meaning of gross income subject to taxation as defined in section 61.

---

[2] All statutory references hereinafter made are to sections of the Internal Revenue Code of 1954 unless otherwise specified.

Respondent's adjustments in this case, because they ignore the cost of goods sold, would go beyond a mere recomputation of taxable income using a different method of accounting from that used by petitioner; they would expand the scope of the Government's taxing power established in the Code (sec. 61) as interpreted by respondent's own regulations. Such a result cannot be sustained under the guise of a section 446(b) accounting method adjustment.

In *Lela Sullenger*, 11 T.C. 1076 (1948), nonacq. 1949–1 C.B. 6, appeal dismissed (C.A. 5, 1950), acq. 1952–2 C.B. 3, we stated at page 1077:

the Commissioner has always recognized, as indeed he must to stay within the Constitution, that the cost of goods sold must be deducted from gross receipts in order to arrive at gross income. *No more than gross income can be subjected to income tax upon any theory. * * * No authority has been cited for denying to this taxpayer the cost of goods sold in computing his profit, which profit alone is gross income for income tax purposes. * * ** [Emphasis added.]

The same principle is applicable here. In *Sullenger* the Commissioner attempted to tax "more than gross income" by improperly reducing cost of goods sold. In the instant case he is attempting to tax "more than gross income" by including therein gross receipts unreduced by *any* cost of the goods sold for those receipts. Though the context in which the adjustment arises here differs, its nature is the same and equally as improper as the one struck down in *Sullenger*. See also *Watkins* v. *United States*, 287 F. 2d 932, 935 (C.A. 1, 1961); *Woodlawn Park Cemetery Co.*, 16 T.C. 1067, 1080 (1951), acq. 1951–2 C.B. 4.

In *Veenstra & DeHaan Coal Co.*, 11 T.C. 964 (1948), acq. 1949–1 C.B. 4, on which petitioner here relies, we held that certain advance payments over which the recipient had unfettered dominion and control were not income in the year of receipt, but only deposits to be later applied on the price of goods. The taxpayer had mingled the advance payments with its general funds in "its one bank account." We pointed out that in the case of sales of property the gross income of the vendor is the gain derived from the sale, and that until the sale is closed and consummated the gain which constitutes gross income to the vendor cannot be ascertained. We need not repeat here the detailed and careful analysis we made in that opinion, which has been cited and relied on many times in the almost 20 years since it was written. I would follow the rationale and adopt the principles of *Veenstra & DeHaan* here.

The advance payments there were in no sense "restricted" deposits as the majority indicates in its efforts to distinguish the instant case. A careful reading of the *Veenstra* opinion reveals that the payments, required by the taxpayer from its customers, were mingled by the tax-

payer with its other funds and could be used as it saw fit without any restriction whatsoever; we observed that they were equivalent to a forced temporary advance by its customers to the petitioner's working capital. A rationale that would eliminate part payments received without restriction as to use or disposition from income in the year of receipt but include full payments made under similar conditions seems to me to be illogical, to say the least. I would equate the treatment of advance payments for the sale of goods whether or not they were deposits (part payments which might have to be refunded in a subsequent year if the sale fell through) or payments in full. In all events, I would conclude that until the cost of goods sold is ascertained so that the gain therefrom can be determined, no gross income has been realized. "Not until the transaction of sale is a closed one will a gain arise which will constitute gross income to the vendor." *Veenstra & DeHaan Coal Co., supra* at 967.

Since the findings of fact here clearly show that at the end of each taxable year the petitioner did not and could not know what the cost of signs to be manufactured and delivered in subsequent years would be, there could be no "item of gross income," includable under section 451(a) in the year of receipt, arising from prepaid sales of signs not completed or delivered in the year of payment. The advance payments were not gains from sales, hence they were not items of gross income subject to tax in the year of receipt. It therefore makes no difference whatever that petitioner held the receipts under claim of right or that they were commingled with its general corporate funds. The claim-of-right doctrine applies to items of income, not to gross receipts or other moneys which are not income. *North American Oil Consolidated* v. *Burnet*, 286 U.S. 417 (1932), makes it clear that the doctrine applies only to "net profits" and "earnings," not gross receipts.

With all due deference and respect, I think that the majority here has fallen into a misconception similar to the one to which we referred in *Veenstra & DeHaan, supra* at 967, and has relied on cases involving advance payments for personal services where the transactions were closed in the year of payment. The majority hangs its hat on a whole line of service cases which in my view are necessarily distinguishable. *Automobile Club of New York, Inc.*, 32 T.C. 906 (1959), affd. 304 F. 2d 781 (C.A. 2, 1962), relied on so heavily, was clearly a service case and the "items" discussed were clearly income, not gross receipts. We specifically noted there that there was no dispute that the amounts involved were *income* and that the only question was *when* it should be taxed.

The general proposition that in service cases, advance payments constitute income when received irrespective of whether or not the taxpayer is on the cash or accrual basis of accounting is now well estab-

lished. *Schlude* v. *Commissioner*, 372 U.S. 128 (1963); *American Automobile Association* v. *United States*, 367 U.S. 687 (1961). Under section 61(a)(1), unadjusted gross receipts for personal services to be rendered represent gross income immediately upon receipt, and there is no question of cost of goods sold; the taxpayers in such cases, receive items of gross income in the year they are paid for their services. The question in the service cases is whether amounts which are admittedly items of gross income in the year of receipt can properly be deferred to subsequent periods when the income will be "earned," within the rules of sections 451 and 446. In *Schlude* and *A.A.A.*, it was held that the deferrals of such income did not properly reflect income. As we observed in *E. Morris Cox*, 43 T.C. 448 (1965), the decision in *Schlude* was rested upon the sweeping ground that in the absence of specific statutory provision, it is not open to a taxpayer to defer *income* to a later period.

In the instant case, by contrast, the question is not whether *income* may be deferred, but, more basically, whether the gross receipts here involved may even be treated as gross income in the years of receipt within the meaning of section 61. As explained in section 1.61-3(a) of the Income Tax Regulations:

(a) *In general.* In a manufacturing, merchandising, or mining business, "gross income" means the total sales, *less the cost of goods sold.* * * * The cost of goods sold should be determined in accordance with the method of accounting consistently used by the taxpayer. [Emphasis supplied.]

I have already indicated my view that the receipts from petitioner's orders for signs do not constitute gross income; whether or not income is ultimately realized from such receipts can only be determined after the cost of those signs has been ascertained and subtracted therefrom to determine petitioner's profit, if any. There being no gross income arising from these receipts in the year of payment, I would conclude that respondent erred in his determination and that the *Schlude*, *A.A.A.*, and other service cases cited by the majority dealing with deferral of admitted gross income are not controlling here.

Because *Chester Farrara*, 44 T.C. 189 (1965), was presented and argued as an accounting system case, we did not consider the nature of the advance payments but merely assumed, as did the parties, that they were income. I would not follow it here where the issue is raised and must be met; to the extent that it is inconsistent with the views expressed in this dissent, I would overrule it. Likewise, *Fifth and York Co.* v. *United States*, 234 F. Supp. 421 (W.D. Ky. 1964), is clearly distinguishable on its particular facts and is not persuasive authority here; I would not rely on it in the instant case.

Even if this case only involved an accounting method issue, rather than the more basic section 61 problem, I would still hold against

the respondent. In the instant circumstances petitioner's method of accounting accomplishes the matching of gross receipts and cost of goods sold so as to clearly reflect income; respondent's adjustments do not.

A taxpayer who deals in services may deduct the costs related to the rendition of those services in the period in which those costs are incurred. Thus, although advance payments for the performance of services may have to be included in income in the year received, at least a taxpayer is able to offset this income by whatever costs were incurred in that same initial year.[3] For example, if it is supposed that in a taxable year a dance studio received advance payment for 10 dancing lessons and by the end of the year had rendered 5 lessons, the studio would be entitled to deduct in that year the franchise and sales commissions on all of the advance payments plus the entire cost of rendering the 5 lessons.

By contrast, however, petitioner is required to defer its manufacturing costs by accumulating them in yearend inventories until such time as the goods are delivered to the customer. Sec. 1.471-1, Income Tax Regs. It is not until delivery that manufacturing costs can be offset against customer receipts as part of the cost of goods sold. Petitioner's method of deferring related prepaid receipts to the same period produces an accurate determination of the gain, if any; an appropriate matching of costs with related revenues in the period in which title to the goods passes and they are removed from inventory.

On the other hand, respondent's adjustments here cause a gross distortion of income. Advance receipts are included in income in the year of receipt. Yet the cost of goods to be purchased by those receipts must be included in yearend inventory (and are thereby excluded from cost of goods sold) under respondent's regulations, until such goods are delivered. Thus, gross receipts are taxed as gross income in one year and the cost of producing the goods for which advance payment was received is not deducted until the year of delivery. The respondent's adjustments can hardly be said to more clearly reflect income than petitioner's generally accepted accounting method.

In the instant case, although the petitioner did not know exactly when all of the ordered signs would be delivered, it knew that they would all have to be delivered eventually. It did not defer its advance receipts "artificially" to periods in which it was merely *estimated* that the goods would be delivered as in *A.A.A.* and *Schlude*—but rather, advance payments for signs were held in the deferral account

---

[3] As a matter of fact, the dance studio in *Schlude* incurred expenses and took deductions for franchise royalties and sales commissions at the time it received advance payment for lessons. 372 U.S. at 131.

until the signs were *actually* delivered, and then the advance was taken into sales income. Thus, income from the sale of signs was recognized in the period the signs were delivered. Costs of producing such signs were also taken into account in the year of delivery (by the removal of those costs from yearend inventory). There is nothing "artificial" about this method of matching revenue with production cost in the period when the goods are delivered.

According to the majority view, if petitioner here received advance payment in one year for 10 signs and by the end of the year he had all 10 signs 90-percent completed but still on hand, not 1 cent of the cost of partially completing the 10 signs would be included in cost of goods sold to be offset against gross sales receipts in that year; the entire cost incurred to date would be included in yearend inventory. All prepaid receipts would be current (year-of-receipt) income but yet such current income could not be offset by current costs (of partial completion), which costs would have to be deferred.[4] This would distort income and produce an incongruous result. *Beacon Publishing Co.* v. *Commissioner*, 218 F. 2d 697 (C.A. 10, 1955), reversing 21 T.C. 610 (1954).

The absurdity of the result reached here is demonstrated by applying respondent's determination as upheld by the majority view to the following supposititious factual situations:

*First.*—In 1966 a sign manufacturer commences business and is paid in advance upon the signing of 100 contracts for 1,000 signs at a price of $100,000. In the same year the signs are completed and delivered at a cost of $110,000. No gross income from the sale of the signs is realized because there was no gain, and no tax need be paid for 1966 or for any other year on the proceeds from these sales.

*Second.*—Same manufacturer; same advance payments on same contracts for same signs at same price in same year. Taxpayer does not begin manufacture of the signs and incurs no costs therefor in year of advance payment. The next year, 1967, taxpayer completes and delivers the same signs at the same cost, $110,000. Taxpayer has gross income of $100,000 from the sale of the signs reportable as such in 1966 and is required to pay tax on that amount of income for that year, unreduced by any cost of goods sold whatsoever. All costs for the signs are chargeable in 1967 but not against the proceeds from sale of the 1,000 signs paid for in 1966.

---

[4] While it might be argued that this problem could be overcome by excluding from yearend inventories (and *including* in cost of goods sold) the costs allocable to goods on hand (finished or in process) for which advance payment has been received, such adjustments would be contrary to sec. 1.471–1, Income Tax Regs., would force manufacturers to adopt burdensome and costly job-cost accounting systems, and would produce such a breakdown of fundamental principles of cost of goods sold accounting as would virtually nullify the integrity of any accounting system and denude sec. 446(a) of any meaning whatsoever See also the last sentence of sec. 1.61–3(a), Income Tax Regs.

*Third.*—Same manufacturer, same advance payments on same contracts for same signs at same price in same year. Taxpayer almost completes manufacture of all 1,000 signs, *but not quite.* Costs of $105,000 are incurred in 1966 but no signs are completed or delivered in 1966 so that all partially completed signs are included in yearend inventory for that year. In 1967 taxpayer completes and delivers all 1,000 signs at an additional cost of $5,000 that year. Taxpayer has a gross income of $100,000 from the sale of the signs in 1966, and is required to report and pay tax on that amount for that year unreduced by any cost whatever even though it was clear at the end of the year that his entire year's business would result in no gain and no gross income from the sale of the 1,000 signs upon final completion and delivery. In 1967 his total cost of $110,000 for the 1,000 signs is chargeable against that year's gross receipts from sales, if any, but not against receipts from the 1966 sales of 1,000 signs.

When these results are compared with the results which flow from an application of the rationale of *Veenstra & DeHaan* it is obvious that the taxpayer's long-used method of accounting for the sales it makes to advance payment customers clearly reflects *income* whereas respondent's method results in a distortion of income as well as taxation of gross receipts from the sale of goods. It is all very well to talk about "transactional" basis as distinguished from "annual" basis required in tax accounting as the majority does. However, if a transaction does not result in gross income so that there is no item of gross income to be reported or included in taxable income in any given year, it hardly is either good tax accounting or good tax law to adopt the "it all comes out in the wash" approach which results in an obvious distortion of income and in fact the annual taxation of returns of capital instead of income.

In *Pacific Grape Products Co.*, 17 T.C. 1097 (1952), the taxpayer's method of accounting was disapproved and the Commissioner's determination that it did not clearly reflect income was upheld. A dissenting opinion was filed by one judge, joined by five others, which read as follows:

OPPER, J., dissenting: The practice of disapproving consistent accounting systems of long standing seems to me to be exceeding all reasonable bounds. * * * Methods of keeping records do not spring in glittering perfection from some unchangeable natural law but are devised to aid business men in maintaining sometimes intricate accounts. If reasonably adapted to that use they should not be condemned for some abstruse legal reason, but only when they fail to reflect income. There is no persuasive indication that such a condition exists here. * * *

It will not do to say that respondent should not have disturbed petitioner's accounting method, but that since he has done so, we are powerless to do otherwise. As long as we continue to approve the imposition of theoretical criteria in so purely practical a field, respondent will go on attempting to seize on such recurring fortuitous occasions to increase the revenue, even though he may ac-

tually accomplish the opposite. I think it evident that petitioner's generally recognized accounting system did not distort its income and that it should be permitted to continue to use it. * * *

VAN FOSSAN, MURDOCK, LEECH, JOHNSON, and TIETJENS, JJ., agree with this dissent.

[Citations omitted.]

The Court of Appeals for the Ninth Circuit reversed us, 219 F. 2d 862 (C.A. 9, 1955), saying:

Finally, we are of the view that the petitioner's method of accounting clearly and accurately reflected its income wholly apart from the question whether title to the goods did or did not pass to the buyers on the dates of billing. Upon this aspect we are agreed with what the six dissenting judges said in this case.[10] [Footnote omitted.]

I think it patently clear that respondent's determination here results in the inclusion of gross receipts from sales in the year of receipt without allowance of cost of goods sold; thus return of capital is included in taxable income instead of the gain from the sale of goods. I think it also evident here that respondent clearly abused his discretion by disapproving petitioner's long-used and generally recognized accounting system which clearly reflected the advance payment income in dispute. Respondent's adjustments result in a distortion of income and are clearly arbitrary.

I would hold for the petitioner.

FORRESTER, J., agrees with this dissent.