*Decision will be entered under Rule 50.*

NORTHERN NATURAL GAS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4372–63. Filed April 14, 1965.

*James W. R. Brown,* for the petitioner.
*Jerry M. Reinsdorf,* for the respondent.

MULRONEY, *Judge:* Respondent determined a deficiency in petitioner's income tax for the calendar year 1955 in the amount of $33,145.18.

There are two issues: (1) Were certain costs incurred by the Northern Natural Gas Co. in transporting its gas deductible expenses or part of the inventory costs of the gas it sold and (2) what was its cost of gas purchased from its subsidiary.

### FINDINGS OF FACT

Petitioner is a corporation with its principal office in Omaha, Nebr. Its income tax return for 1955 was filed with the district director of internal revenue, Omaha, Nebr.

Petitioner purchases gas in Kansas, Oklahoma, Texas, and New Mexico and resells it to customers located in each of those States as well as in Nebraska, Iowa, South Dakota, and Minnesota. During the year in issue it owned and operated a pipeline transmission system

through which it transmitted the gas it purchased. The system extended from points in Texas to Palmyra, Nebr., where the system divided into two lines. One of these lines extended northwardly past Omaha, Nebr., and Sioux City, Iowa, and then northeasterly to Minneapolis and St. Paul, Minn. The other line extended northeasterly from Palmyra, Nebr., to a point north and west of Des Moines, Iowa, and then northwardly to Minneapolis and St. Paul. The system included several parallel lines of large-diameter pipe through which the gas moved under high pressure. Petitioner made deliveries of gas to customers all along the transmission line, although its major market area was generally north of Kansas.

When there would be extreme cold spells during the winter months in such States as Iowa and Minnesota there would be sharp increases for the demand for gas which could overtax the capacity of the pipeline. Petitioner had customers who, for a reduced rate, would agree to curtailment or to switch to another fuel when the capacity was needed for customers who had not agreed to curtailment. In the summer months the pipeline operated at less than full capacity.

For the purpose of utilizing its transmission system in an efficient manner petitioner in 1954 began the operation of a large underground storage facility at Redfield, Iowa. In 1955 the excess pipeline capacity in the summer was used to transport gas to Redfield where it could be held in storage and used to meet the sudden increase demands during winter cold spells.

In its income tax return for 1955 petitioner deducted the cost of transporting gas to its storage facility in Redfield, Iowa, as part of its operating expenses.

During 1955 petitioner purchased gas from Permian Basin Pipeline Co., hereinafter called Permian. During 1955 Permian's capitalization consisted in part of 1,653,000 shares of $1 par value common stock. During 1955 petitioner owned 83.68 percent of Permian's outstanding common stock. The remaining 16.32 percent of Permian's common stock was distributed among stockholders who were not related to or controlled by petitioner. Permian's board of directors consisted of seven members who were elected under the method known as cumulative voting, under which the minority shareholders could always elect one director if they chose to cast their votes together. In 1955 one of Permian's directors was entirely independent of petitioner. In addition to common stock, Permian's capitalization during 1955 consisted of 45,000 shares of 5¾-percent cumulative preferred shares with a total par value of $4,500,000. All of the holders of Permian's preferred stock were independent of petitioner's control.

Petitioner helped to finance the construction of the Permian pipeline. It contracted for Permian's gas on a long-term basis and agreed to

advance to Permian all funds needed by Permian to meet operating costs and sinking fund requirements on the mortgage loan obtained to finance construction of the Permian pipeline. Petitioner furnished funds to Permian for financing the construction of the Permian pipeline in the following amounts:

| Date | Nature of transaction | Amount |
|---|---|---|
| July 30, 1952 | Stock subscription | $102,000.00 |
| Mar. 25, 1953 | ____do____ | 81,600.00 |
| Oct. 6, 1953 | ____do____ | 5,790,500.00 |
| June 2, 1953 to Aug. 21, 1953 | Interim loans | 8,941,336.44 |
| Sept. 4, 1953 to Sept. 18, 1953 | ____do____ | 4,172,700.00 |
| Sept. 23, 1953 to Oct. 9, 1953 | ____do____ | 3,873,700.00 |
| Oct. 21, 1953 to Oct. 30, 1953 | ____do____ | 1,950,000.00 |
| Oct. 4, 1954 to Nov. 29, 1954 | ____do____ | 2,785,000.00 |
| Aug. 31, 1953 | Interim note | 4,550,000.00 |
| Total | | 32,246,836.44 |

By contract dated August 14, 1953, petitioner agreed to loan to Permian during each calendar year that Permian's mortgage bonds remained outstanding the amount by which the sum of Permian's (1) operating expenses, (2) income and other taxes, (3) interest charges and depreciation provision for such year, and (4) sinking fund requirements in excess of the depreciation provision, exceeded in each such year Permian's gross revenues for that year.

Petitioner loaned money to Permian on notes and was repaid with interest. Petitioner furnished material to Permian and its personnel kept Permian's books and it made some advances to Permian on open account and its employees did work for Permian. Petitioner received monthly reimbursement for such advances and the cost of such services and material. Both petitioner and Permian were subject to regulation by the Federal Power Commission. Originally Permian had filed a tariff with the Commission whereby there would be a fixed price for the gas. However, the Commission found that Permian was an operating subsidiary of petitioner and fixed a tariff called cost-of-service tariff. In this cost-of-service tariff Permian was permitted to recover all of its cost of gas from its suppliers and the cost of operating its pipeline plus 6 percent on its investment. In computing its 1955 ending inventory figure petitioner used, as its cost of gas purchased from sellers other than Permian, the invoice price it paid to the sellers. The cost of gas purchased from Permian was taken at the price Permian paid its suppliers, rather than the price Northern paid to Permian.

Respondent in his notice of deficiency determined petitioner had understated its inventory of gas stored at Redfield and explained his adjustment as follows:

(a) It is determined that you understated your December 31, 1955, inventory of gas stored at Redfield, Iowa, by $63,740.73 and overstated your 1955 operating expenses by a like amount, as detailed in the revenue agent's report dated June

19, 1962, because (1) the cost of gas you acquired through the Permian Basin Pipeline Company was understated in computing your inventory of gas stored and (2) the cost of transporting gas to Redfield, Iowa, for storage should be included as a part of the inventory cost of the gas rather than deducted as a transportation expense. Therefore, your taxable income before special deduction is increased by the amount of $63,740.73.

OPINION

During the taxable year petitioner purchased gas from suppliers in producing areas and transported it in its pipeline to its customers located all along the pipeline and to its underground storage facility located in its major marketing area at Redfield, Iowa. Petitioner deducted all transportation expenses as part of its cost of doing business and reported its inventory of gas stored at Redfield at the price it paid suppliers in the producing areas (except purchases from Permian, which will be mentioned later). Respondent determined that a portion of the gas transportation expenses represented cost of transporting gas to storage and such costs should be included as a part of inventory cost of gas and not deducted as transportation expenses.

It is admitted here petitioner was required to and did use an inventory in computing income. Section 471 gives respondent the authority to prescribe the proper basis for taking such inventory.[1] He has done this in section 1.471–3(b) of his regulations under the 1954 Code, as follows:

(b) In the case of merchandise purchased since the beginning of the taxable year, the invoice price less trade or other discounts, except strictly cash discounts approximating a fair interest rate, which may be deducted or not at the option of the taxpayer, provided a consistent course is followed. To this net invoice price should be added transportation or other necessary charges incurred in acquiring possession of the goods.

All of the gas that reached storage was transported to the storage area through petitioner's pipeline system. In his answer respondent specifically "admitted that during the taxable year, all of the gas transported through this system was owned by petitioner." Respondent's position seems to be that under his regulation transportation costs incurred before "acquiring possession" of the gas are includable in inventory cost and here petitioner really did not acquire possession of the gas that was ultimately stored within the meaning of the regulation until the gas was actually stored at Redfield. In other words, respondent's position is that the gas that was confined in petitioner's pipeline and admittedly owned by petitioner and over which it exercised complete dominion and control as to its every movement, was

---

[1] SEC. 471. GENERAL RULE FOR INVENTORIES.

Whenever in the opinion of the Secretary or his delegate the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

somehow not in petitioner's "possession." He supports his position with an argument (and no authority) that his regulation "cannot be interpreted as saying that possession is acquired the instant custody is transferred from seller to buyer." He contends on brief that possession was being acquired by petitioner, within the meaning of this regulation, over a period of time that commenced with the purchase and entry of gas into petitioner's pipeline in the producing area (when he admits ownership of the gas passed to petitioner) and ended when the gas reached Redfield. And respondent argues on brief that—

The word "acquiring" [in the regulation] is a gerund and as such its use in section 1.471–3(b) is indicative of a continuing transaction and is a clear recognition that the acquisition of possession may be a gradual process that is not necessarily complete the instant the purchaser obtains custody of the merchandise. See e.g., Webster's Third New International Dictionary (G. & C. Merriam Co., 1961) where gerund is defined as: "1. a verbal noun in Latin that * * * expresses the action of the verb as generalized or in continuance * * *."

Respondent is driven to this argument that places an unusual meaning on the phrase "in acquiring possession" in his regulation for it would be hard to imagine a case where all of the admitted and undisputed facts so clearly show petitioner's complete possession of the gas upon its entry into petitioner's pipeline within the usual and well-understood meaning of the word "possession."

It is to be noted that the inventory method prescribed by the regulation must, under section 471, conform as nearly as possible "to the best accounting practice in the trade or business." Petitioner and all other natural gas companies are subject to regulation in the manner of accounting for costs by the Federal Power Commission. In its Uniform System of Accounts prescribed by the Commission it is provided, in part, at page 23, as follows:

134. Gas Stored Underground.

A. This account shall include the cost of gas purchased or produced by the utility which is stored in depleted or partially depleted gas or oil fields, or other underground reservoirs, and held for use in meeting service requirements of the utility's customers.

B. Gas stored during the year shall be priced at cost according to generally accepted methods of cost determination consistently applied from year to year. Transmission expenses for facilities of the utility used in moving the gas to the storage area and expenses of storage facilities shall not be included in the inventory of gas except as may be authorized by the Commission.

The records of the Federal Power Commission show there were 28 interstate gas pipeline companies with storage facilities in 1955, and only 1 of these companies included part of its transmission costs in its inventory of stored gas.

Of course, this Court is not bound by the accounting rules of the Commission (Gulf Power Co., 10 T.C. 852) but in interpreting respondent's regulation it must be assumed the said regulation reflects the best accounting practice in the industry. It would hardly do that

if the regulation were interpreted to prescribe an accounting method that almost no one in the industry uses.

Without further comment with respect to respondent's argument, we reject the same and hold that the phrase "in acquiring possession" should be given its ordinary meaning and that possession of the gas was acquired before the transportation charges were incurred. We hold petitioner was right in not adding transportation charges to its invoice price of the gas.

The second issue involves the cost of gas purchased from Permian. In computing its ending inventory in 1955 petitioner used as its cost of gas purchased from Permian, the amounts which Permian paid its suppliers. Petitioner actually paid Permian for the gas it purchased, an amount which included Permian's cost, plus its operating expenses, and an amount that gave Permian 6-percent-per-annum return on its investment. Respondent determined petitioner's cost of gas purchased from Permian was the amount it paid Permian, rather than the amount Permian paid to its suppliers.

Respondent is right. It is admitted Permian was at all times operated as a separate entity. The separate entities were observed for accounting purposes and each filed separate income tax returns and separate reports to the Federal Power Commission.

Petitioner attempts to justify its use of Permian's costs of gas as its cost by arguing it was really the operator of Permian's pipeline. The evidence is all against such a contention. The fact that petitioner controlled Permian and loaned money to Permian, and shared officer personnel with Permian, would not make petitioner the operator of Permian's pipeline. Permian's separate entity must be preserved. *Moline Properties, Inc.* v. *Commissioner*, 319 U.S. 436; *National Carbide Corporation* v. *Commissioner*, 336 U.S. 422. Petitioner's chief argument seems to be that the Federal Power Commission treated Permian's operation as petitioner's by making petitioner pay a rate that would pay all of Permian's costs plus 6-percent return on its investment. Without admitting that the Commission's determination would be binding on this Court, it is obvious that the determination was merely for ratemaking purposes. If the Federal Power Commission had considered Permian's operation to be petitioner's operation, it would have ordered Permian to sell to petitioner at cost. The allowance of a profit to Permian indicates the Commission considered Permian's operation was not petitioner's operation. We hold for respondent on the issue.

The foregoing disposes of the only two issues that respondent says remain in this case and we are also told in respondent's brief that the parties can agree with respect to the Rule 50 computation when these issues are decided.

Reviewed by the Court.

*Decision will be entered under Rule 50.*