T.C. Memo. 1997-569


UNITED STATES TAX COURT


DAVID K. STRAIGHT, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 23658-94.          Filed December 29, 1997.


<u>David D. Aughtry</u> and <u>Donald P. Lancaster</u>, for petitioner.

<u>William L. Blagg</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>: Respondent determined deficiencies in petitioner's Federal income tax and accuracy-related penalties as follows:

| Year | Deficiency | Penalty Sec. 6662[1] |
|------|-----------|----------------------|
| 1990 | $433,706 | $86,741 |
| 1991 | 9,741 | 1,948 |
| 1992 | 4,354 | 871 |

[1] Respondent concedes that petitioner is not liable for the accuracy-related penalty.

Petitioner was the sole shareholder of Eagle's Nest Homes, Inc. (Eagle), an S corporation which sold panelized houses.

Deposits Issue. Eagle, an accrual method taxpayer, received customer deposits under written purchase agreements. The deposits issue for decision is whether, as petitioner contends, Eagle may defer reporting some of its customer deposits under section 1.451-5, Income Tax Regs., or under other income tax accounting rules. We hold that it may not.

Procedural Issues. Respondent's revenue agent prepared a 30-day letter in this case. Respondent's revenue agent included a chart in the 30-day letter with columns for 1990 and 1991 showing the amount of Eagle's gross receipts reported on the return and per the audit. Respondent's revenue agent later added a column for 1992 to the chart. Respondent's counsel gave petitioner a copy of the modified 30-day letter to include in the stipulation. Respondent's revenue agent initially testified that she had not added the third column but later testified that she had added it.

Respondent concedes that the agent's conduct warrants imposition of a sanction. Respondent contends that the sanction

should be to shift the burden of proof to respondent for 1992. Petitioner contends that we should strike respondent's answer.

The notice of deficiency did not contain the explanation for respondent's position which respondent had previously stated in the 30-day letter. Petitioner contends that respondent should bear the burden of proof because the notice of deficiency did not state the basis for the tax due as required by section 7522. Respondent concedes that shifting the burden of proof is appropriate if section 7522 is violated, but contends that it was not violated here. The procedural issues for decision are:

1. Whether respondent should bear the burden of proof because the notice of deficiency did not describe the basis for the amounts of tax due as required by section 7522, or because of respondent's agent's conduct in this case. We need not reach this issue because respondent prevails regardless of which party bears the burden of proof.

2. Whether striking respondent's answer is an appropriate sanction for respondent's agent's conduct in this case. We hold that, instead of striking respondent's answer, we will impose a $5,000 penalty on respondent.

Section references are to the Internal Revenue Code in effect for the years in issue. Unless otherwise indicated, Rule references are to the Tax Court Rules of Practice and Procedure.

I. FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.    Petitioner

Petitioner lived in Alpharetta, Georgia, when he filed the petition in this case.

B.    Eagle's Nest Homes and Timberline Building Systems

1.    Formation, Ownership, and Tax Status of Eagle's Nest Homes

In 1983, petitioner and Lawrence Gandolfi (Gandolfi) incorporated Eagle's Nest Homes, Inc. (Eagle), in North Carolina. Eagle sold panelized house kits; i.e., prefabricated houses which were shipped to homesites to be assembled. Initially, Eagle's offices were in Kannapolis, North Carolina. In 1987, Eagle moved to Canton, Georgia. Gandolfi and petitioner each owned 50 percent of Eagle's stock before 1990. Petitioner became the sole shareholder of Eagle in 1990.

Eagle was a C corporation before July 29, 1990. Eagle elected to be an S corporation effective July 29, 1990. Eagle had a short taxable year from July 29 to December 29, 1990.

2.    Timberline Building Systems

Petitioner, Michael Goss (Goss), Gandolfi, and others formed Timberline Building Systems (Timberline) in 1986. Goss was the president of Timberline. Petitioner owned 50 percent of the stock of Timberline. Timberline was an S corporation.

Timberline manufactured panelized house kits for Eagle and shipped them to Eagle's customers. Timberline's manufacturing facilities were in Greenwood, South Carolina.

### 3. House Purchase Agreement

Persons who wanted to buy a house from Eagle signed a purchase agreement. The purchase agreement was between Eagle and the customer. The purchase agreement specified the model to be built, the square footage, and the price.

### a. Front Deposits

Before 1991, a customer paid a $4,000 deposit, which Eagle and its customers referred to as a "front" or "front deposit", when he or she signed a purchase agreement. In 1991, Eagle raised the amount of the front deposit to $5,000. The purchase agreement stated that the front deposit was nonrefundable.

Eagle paid commissions of $650 to the employee who was responsible for a sale when it received a $5,000 front deposit.[1]

The purchase agreement stated that once a customer paid the front deposit, he or she had 15 days to provide specifications to Eagle and 60 days to submit a house purchase order, accompanied by full payment or an acceptable method of paying the balance.

---

[1] Eagle also paid commissions when it received the $4,000 deposits. Eagle deducted these commissions in the year it received the deposits.

Before submitting an order to Eagle, customers began working with Eagle's engineering department, selected the final design, and obtained financing. Eagle produced the blueprints. Some customers wanted different floor plans, different windows, or windows in different places than shown on the original plans. Eagle's engineers prepared the blueprints accordingly.

### b. Back Deposits

If a customer did not pay for the house or arrange for financing within 60 days, the purchase agreement stated that he or she could pay a second deposit ($4,000, increased to $5,000 in 1991), which Eagle and its customers called a "back deposit" or a "back". The purchase agreement stated that back deposits were nonrefundable. Eagle paid commissions of $450 to the person who was responsible for the sale when it received a $5,000 back deposit. The purchase agreement provided that if a customer paid the back deposit, full payment could be made any time until 15 days before the house shipment date. The agreement is silent about what would happen if a customer failed to pay in full at that time.

The purchase agreement states that it is the entire agreement between the parties respecting the purchase of an Eagle's Nest house.

When a customer submitted a purchase order and full payment (including for shipping), Eagle ordered the house kit from Timberline. Ninety percent of Eagle's expenses occurred from 30 days before an order was placed to 30 days after Timberline delivered the house kit to the customer. Timberline usually delivered the house kit 4 to 6 weeks after a customer placed an order.

        c.    Extension of Purchase Agreements and Refunds of Deposits

Eagle's business practices differed from the purchase agreement in two ways, primarily to retain goodwill from potential customers. First, Eagle refunded about $136,000 in front and back deposits from 1988 to 1992. Second, if Eagle did not receive full payment in 75 days, Eagle issued a change order in which Eagle agreed to apply the payments to a purchase of a panelized house during the next 7 years. If a customer placed an order for a panelized house kit under a 7-year change order, Eagle charged the customer the retail price prevailing when the order was placed.

    4.    Eagle's Payments to Timberline

Timberline billed Eagle for house kits and was paid when the customer paid Eagle.

Ninety percent of Eagle's house sales were financed by letters of credit. When a customer financed a sale by a letter

of credit, the customer paid Eagle 3 to 10 days after delivery. Eagle promptly notified Timberline to send an invoice, which Eagle paid on receipt.

Some of Eagle's customers paid cash. Those customers paid Eagle 15 days before delivery. Timberline then sent a bill to Eagle which Eagle paid on receipt.

Timberline usually sold house kits to Eagle at the price in effect when Eagle placed the order. Eagle lost money on some house contracts each year because Timberline's price was not fixed until Timberline billed Eagle around the time of delivery. Timberline bought commodities such as lumber and plywood products to use in the kits. Timberline sometimes changed the prices it charged Eagle to offset increases in the prices of commodities it used.

Timberline shipped the house kits to Eagle's customers. Eagle billed its customers for the shipping costs.

5. Eagle's Accounting Method

a. Accrual Method

Eagle consistently used the accrual method of accounting for financial and tax purposes.

b. 1990 Study

Eagle's accountant, William E. Gross (Gross), analyzed Eagle's experience with customer deposits. Gross counted how

many purchase agreements had been signed in each year since 1986 that had not been fulfilled by delivery of a house kit (open agreements) by July 28, 1990.  Gross calculated the percentage of purchase agreements signed in each year that had been fulfilled by the delivery of a house kit (closed agreements) by July 28, 1990.  Gross then applied these percentages to the number of agreements open on July 28, 1990, to project the number of contracts that would close within 4 years.  Gross estimated that 293 of the 515 contracts open on that date (57 percent) would never close.

c.    Eagle's Accounting for Deposits

Eagle did not maintain a separate bank account for the deposits.  Eagle deposited them in its general operating account and used them to pay its current expenses.

Eagle first included customer deposits in income based on the 1990 study for its tax year ending July 28, 1990.  For its tax year ending July 28, 1990, Eagle included in income 57 percent of all unapplied customer deposits at the end of that year.[2]  Eagle recorded the 43 percent of customer deposits which it had not reported as income as a liability.[3]

---

[2] Unapplied deposits are deposits for houses for which Eagle did not receive all of the purchase price in that year.

[3] Eagle recorded the amount of its unapplied deposits in a liability account.  Eagle reported unapplied deposits in income
(continued...)

Eagle recorded the following amounts of customer deposits in its liability account:

| Tax year ending | Amount in liability account |
|-----------------|------------------------------|
| July 31, 1989 | $1,774,497 |
| July 28, 1990 | 1,330,830 |
| Dec. 29, 1990 | 1,505,102 |
| Dec. 28, 1991 | 1,503,403 |
| Jan. 2, 1993 | 1,517,037 |

For the years ending December 29, 1990, and December 28, 1991,[4] Eagle included in income (i) the purchase price (including deposits) of houses delivered that year; and (ii) the percentage of unapplied deposits on hand at the end of that year which, based on the 1990 study, Eagle would not apply to a house purchase within 4 years. For those years, Eagle reported the amount it paid to Timberline as cost of goods sold. Eagle recorded customer deposits which it had not included in income as a liability on its balance sheets and tax returns.

_____

[3](...continued)
when it applied them to a house purchase within 4 years. Eagle reported customer deposits not included in income as a liability on its tax returns.

[4] We will sometimes refer to Eagle's tax year ending Dec. 29, 1990, as its 1990 tax year, year ending Dec. 28, 1991, as its 1991 tax year, and year ending Jan. 2, 1993, as its 1992 tax year.

For its year ending January 2, 1993, Eagle included in income (i) the purchase price (including deposits) of houses delivered in 1992, and (ii) all unapplied deposits on hand at the end of 1992.

For its 1990 tax year, Eagle reported $275,651 of deposits in income and deferred reporting $1,505,102 of deposits. For its 1991 tax year, Eagle reported $304,389 of deposits in income and deferred reporting $1,503,403 of deposits. For its 1992 tax year, Eagle reported $1,130,830 of deposits in income and deferred reporting $1,517,037 of deposits.

Eagle prepared financial statements for its tax year ending July 28, 1990, and its 1991 and 1992 tax years. Eagle prepared no financial statement for its 1990 tax year.

6. Eagle's Income Tax Returns

Eagle attached a schedule to its 1990, 1991, and 1992 returns on which it reported forfeited deposits[5] as income. Eagle reported as a liability the amount of its customer deposits at the beginning and end of the year. Eagle reported on each return that it used the accrual method of accounting. Eagle also

---

[5] Eagle treated a deposit as forfeited if it did not receive the remainder of the purchase price within 60 days after it received the deposit and the customer paid no back; or, if the customer paid a back, 15 days before the house kit was ready to be shipped and it projected that the contract to which the deposit related would not close.

reported that it used the same method of accounting for book and tax purposes. Eagle reported that it had no inventory at the beginning and end of 1990, 1991, and 1992.

C.   The 30-Day Letter

Before June 1993, respondent's revenue agent audited petitioner's 1990 and 1991 tax years. On June 25, 1993, respondent's revenue agent prepared a 30-day letter. It contained a detailed explanation of respondent's position relating to Eagle's method of accounting for customer deposits for 1990 and 1991. The 30-day letter stated in part as follows:

> Treasury Regulation 1.451-5(a) deals with advance payments for a taxpayer using an accrual method of accounting for purchases and sales or a long-term contract method of accounting, pursuant to, and to be applied against, an agreement:  (i) for the sale or other disposition in a future taxable year of goods held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or (ii) for the building, installing, constructing, or manufacture by the taxpayer of items where the agreement is not completed within such taxable year. The taxpayer does not qualify under (i) since the corporation has no inventory and is never at risk for loss during shipment. The corporation merely acts as a broker for homes manufactured by Timberline Building Systems, Inc. Neither does the business qualify under (ii) since it does not build, construct, install, or manufacture the modular homes. Costs are not accumulated until income is recognized, rather some costs related to the sale such as commissions are expensed before the income is recognized.
>
> Since the deposits do not qualify as "advance deposits", they cannot be included in income as provided in Treasury Regulation 1.451-5(b)(1)(ii)(a) namely "in the taxable year in which properly accruable

under the taxpayer's method of accounting for tax purposes if such method results in including gross receipts no later than the time such payments are included in gross receipts for purposes of all reports to third parties."  Instead the deposits must be included in income under the general rule - when actually received.

Finally, 1.451-5(d) requires that if a taxpayer accounts for advance payments under (b)(1)(ii), he must attach to his income tax return for each year an annual information schedule concerning advance payments.  As already argued, the taxpayer fails to satisfy the definition for advance payments under this section and, further, he failed to attach a statement as required by law.

In a chart on page 6 of the 30-day letter, respondent's agent said that the following adjustments should be made to Eagle's customer deposits:

(a) Gross Receipts -- Deferred Income

|  | 9012 | 9112 |
|---|---|---|
| Per return | $1419282 | $4147691 |
| Per audit | 2934384 | 4145992 |
| Adjustment | $1505102[1] | $  (1699) |

[1] The correct adjustment for 1990 is $1,515,102.  Respondent does not explain this discrepancy.

Respondent's agent did not provide the 30-day letter to petitioner or to his representative during 1993 or 1994.

D.  Notice of Deficiency

Respondent mailed a notice of deficiency to petitioner on September 23, 1994.  In it, respondent determined that petitioner was liable for deficiencies in income tax of $433,706 for 1990,

$9,741 for 1991, and $4,354 for 1992, and accuracy-related penalties of $86,741 for 1990, $1,948 for 1991, and $871 for 1992 under section 6662. Respondent determined that petitioner's distributive share of ordinary income from Eagle for 1990, 1991, and 1992 should be increased. The notice of deficiency stated as follows:

> It is determined that your distributable share of ordinary income from the small business corporation known as "Eagles Nest Homes" is $1,391,539 and $67,822 for the taxable years ended December 31, 1990 and 1992 and your distributable share of ordinary loss is $21,340 for the taxable year ended December 31, 1991 rather than the loss amounts of $148,582 and $39,713 for the taxable years ended December 31, 1990 and 1991 and the amount of $54,188 for the taxable year ended December 31, 1992 as was claimed on your returns for those taxable years. This determination is based on an examination of the corporate return of "Eagles Nest Homes" for the taxable years ended December 31, 1990, 1991 and 1992, which is summarized below. A detailed report has been furnished to the tax matters partner (person) who should be contacted for additional information. Accordingly, your taxable income for the taxable years ended December 31, 1990, 1991 and 1992 is increased by the respective amounts of $1,540,121, $18,373 and $13,634.

| Year | 1990 | 1991 | 1992 |
|---|---|---|---|
| Ordinary income/(loss) per Corp. Return | ($148,582) | ($39,713) | $54,188 |
| Adjustments to income and expenses | | | |
| a. Deferred income - customers dep. | 1,505,102 | (1,699) | 13,634 |
| b. Depreciation | 3,178 | 6,975 | -- |
| c. Advertising | 31,841 | 13,097 | -- |
| | | | |
| Ordinary income/(loss) as determined | 1,391,539 | (21,340) | 67,822 |
| Applicable ownership interest | 100% | 100% | 100% |
| | | | |
| Your distributive share | 1,391,539 | (21,340) | 67,822 |
| Ordinary income/(loss) as reported | (148,582) | (39,713) | 54,188 |
| Increase (decrease) | 1,540,121 | 18,373 | 13,634 |

Respondent's retained copy of the last two pages of the notice of deficiency contained an alternative tax computation for tax years 1991 and 1992 (exhibit B of the notice) and a computation of the accuracy-related penalty for negligence and substantial understatement of income tax under section 6662(c) and (d) for tax years 1990, 1991, and 1992 (exhibit C of the notice). Respondent did not mail those two pages to petitioner.

In summary, the notice of deficiency stated: (1) That respondent had examined Eagle's tax returns; (2) that respondent had furnished a detailed report to Eagle's tax matters partner or person; and (3) for 1990, 1991, and 1992, (a) how much ordinary income and loss and customer deposit income respondent determined Eagle had, and (b) the amount of tax respondent determined petitioner owed.

The notice of deficiency stated that a report had been "furnished to the tax matters partner (person)". This statement was in error in that respondent's agent had not provided the report to petitioner, there was no tax matters partner since Eagle was an S corporation, and Eagle had not named a tax matters person on its 1990, 1991, and 1992 tax returns, Forms 1120S.

On December 22, 1994, petitioner filed his petition in this case.

This case had been calendared for an earlier trial session in Atlanta, Georgia. Respondent moved for a continuance. We granted respondent's motion.

E.   Respondent's Agent's Modification of and Testimony About the 30-Day Report

On October 15, 1996, respondent's counsel sent some documents to petitioner's counsel to include in the stipulation of facts. One of the documents respondent sent was a copy of the revenue agent's June 25, 1993, report, described in paragraph I-C, above.

Petitioner discovered shortly before trial that the copy of the June 25, 1993, report which respondent sent to petitioner differed from the original version in that the chart on page 6 of the report included a column for 1992, as follows:

|              | 9012        | 9112       | 9212       |
|--------------|-------------|------------|------------|
| Per return   | $1419282    | $4147691   | $3306595   |
| Per audit    | 2934384     | 4145992    | 3320229    |
| Adjustment   | $1505102[1] | $ (1699)   | $ 13634    |

[1] The correct adjustment for 1990 is $1,515,102. Respondent does not explain this discrepancy.

The copy that respondent sent to petitioner did not disclose that it differed from the original version. The change makes the letter appear more likely to be the letter to which the notice of deficiency refers because the notice of deficiency states that the letter furnished to the taxpayer was based on an examination of Eagle's 1990, 1991, and 1992 years.

The Court held a hearing on October 29, 1996, relating to petitioner's allegation that respondent had provided an altered document to be included in the stipulation. Respondent's agent testified that she had not added the 1992 column to the report and did not know who did. The Court held a second hearing on October 30, 1996, based on petitioner's allegation that the revenue agent's testimony was false. At the second hearing, respondent's agent testified that she had added the 1992 column.

## II. OPINION

A. Tax Treatment of Eagle's Customer Deposits

1. Petitioner's Contentions

Petitioner contends that Eagle need not report all of its customer deposits in the year received. Petitioner contends that

Eagle's method of accounting for customer deposits clearly reflects income, was consistently used over time, conforms to its method of keeping internal books and records and preparing financial reports, complies with Generally Accepted Accounting Principles (GAAP), and qualifies for deferral under section 1.451-5, Income Tax Regs.

2.   Background

A taxpayer's right to use a method of accounting is subject to the requirement that the method clearly reflect income.  Sec. 446(b).  The Commissioner has broad discretion to determine whether a taxpayer's method of accounting clearly reflects income.  RLC Indus. Co. v. Commissioner, 98 T.C. 457, 491 (1992), affd. 58 F.3d 413 (9th Cir. 1995).

Generally, a taxpayer has the burden of overcoming a determination by the Commissioner that the taxpayer's method of accounting does not clearly reflect income.  Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532 (1979); Ferrill v. Commissioner, 684 F.2d 261, 263 (3d Cir. 1982), affg. per curiam T.C. Memo. 1979-501.  However, as discussed in paragraphs II-B and II-C, below, respondent prevails on the customer deposits issue regardless of which party bears the burden of proof.

We first consider whether petitioner may defer reporting customer deposits if Eagle is not eligible to defer reporting deposits under section 1.451-5, Income Tax Regs.  We will then

consider whether petitioner may do so under section 1.451-5, Income Tax Regs.

B.   Whether Eagle May Defer Reporting of Advance Deposits If Section 1.451-5, Income Tax Regs., Does Not Apply

1.   Standards Applicable If Section 1.451-5, Income Tax Regs., Does Not Apply

Income must be reported in the taxable year in which the taxpayer receives it unless, under the taxpayer's method of accounting, the item of income is properly accounted for in a different period. Sec. 451(a). Petitioner is an accrual method taxpayer. Accrual method taxpayers generally must recognize income when all the events have occurred which fix the right to receive the income and the amount of the income can be determined with reasonable accuracy. Schlude v. Commissioner, 372 U.S. 128, 137 (1963); secs. 1.446-1(c)(1)(ii), 1.451-1(a), Income Tax Regs.

Accrual basis taxpayers must include in income in the year received advance payments for the sale of services that are unrestricted as to their use, even though those payments may not be earned until later years. Schlude v. Commissioner, supra; American Auto. Association v. United States, 367 U.S. 687, 689 (1961); Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 189 (1957). The same principles apply to advance payments for the sale of goods. S. Garber, Inc. v. Commissioner, 51 T.C. 733, 735-736 (1969); Hagen Adver. Displays, Inc. v. Commissioner, 47 T.C. 139, 146-147 (1966), affd. 407 F.2d 1105, 1107 (6th Cir. 1969); Farrara v. Commissioner, 44 T.C. 189, 191 (1965).

In S. Garber, Inc. v. Commissioner, supra, an accrual basis taxpayer was in the business of selling custom-made fur coats. The taxpayer required its customers to make advance payments for coats. The taxpayer treated these payments as liabilities on its books and deferred reporting them as income until the coats were finished. There was no restriction on the taxpayer's use of these payments, and the taxpayer deposited them in its regular bank account. Id. at 734. We held that the advance payments for fur coats to be delivered in the future were includable upon receipt. Id. at 735-736. All of the events had occurred to accrue the deposits into income, and no further inquiry was necessary to determine whether the income had been earned. Id. at 735.

The instant case is substantially like S. Garber, Inc. v. Commissioner, supra. Eagle received customer deposits for house kits. Eagle had an unrestricted right to use these payments upon receipt. Eagle used them to pay its day-to-day expenses. All the events had occurred that fixed Eagle's right to receive the income, and the income could be determined with reasonable accuracy. See Signet Banking Corp. v. Commissioner, 106 T.C. 117, 128 (1996), affd. 118 F.3d 239 (4th Cir. 1997).

Petitioner points out that some of Eagle's contracts lost money and that Eagle did not know which contracts would be

profitable until Timberline delivered the house kits to Eagle's customers. This fact does not affect the outcome of this case; the fact that some of Eagle's contracts lose money does not mean that its customer deposits are not included in income. Standard Television Tube Corp. v. Commissioner, 64 T.C. 238, 241-242 (1975).

Petitioner argues that section 1.451-1(a), Income Tax Regs., establishes that income is includable in the year earned (i.e., the year goods are delivered or services are performed) by an accrual method taxpayer, not the year received. We have declined to adopt petitioner's position that income is not includable until earned. In Standard Television Tube Corp. v. Commissioner, supra, we rejected the theory that reporting of prepaid income should be deferred until the income is earned, citing Schlude v. Commissioner, supra, American Auto. Association v. United States, supra, and Automobile Club, Inc. v. Commissioner, 32 T.C. 906 (1959), affd. 304 F.2d 781 (2d Cir. 1962). See Herbel v. Commissioner, 106 T.C. 392, 412-417 (1996); cf. Highland Farms, Inc. v. Commissioner, 106 T.C. 237, 252 (1996) (refundable entry fees paid to retirement community were not prepaid rent or advance payments for services that had to be reported in year received; taxpayer's method of accounting for the entry fees clearly reflected income because taxpayer reported nonrefundable portion of fees each year), affd. ___ F.3d ___ (5th Cir., Dec. 8, 1997).

2.   Petitioner's Expert Witnesses

a.   Description of the Testimony

Petitioner called Denton R. Hammond (Hammond) and Gross as expert witnesses.  Respondent called no expert witnesses.

Hammond and Gross are certified public accountants.  Hammond specializes in construction industry accounting.  Gross prepared Eagle's tax returns for the years at issue in this case and conducted the study relating to Eagle's deposits.

Hammond and Gross concluded that:  (i) Eagle accounted for payments it received from customers for panelized house kits consistently for both financial and tax purposes, (ii) the method of accounting Eagle used for tax purposes conformed to its books and records and its issued financial statements, (iii) Eagle's method of accounting properly matches income and expenses for financial accounting purposes, and (iv) Eagle's method of accounting complies with GAAP.

Hammond also concluded that Eagle's method of accounting clearly reflects its income for the years in issue, is as accurate in reporting the results of operations as accounting systems allow, and complies with GAAP as provided in the AICPA's Statement of Position 81-1, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts".  He also concluded that respondent's method mismatches items of revenue and expense under GAAP.

Gross also concluded that Eagle's method of accounting conforms to the Statement on Standards for Accounting and Review Services issued by the AICPA, and that the method of accounting proposed by respondent materially overstates income for purposes of GAAP for the tax year ending December 31, 1990.

Respondent called no accounting experts and did not show the opinions and conclusions of petitioner's experts to be incorrect. We accept the conclusions of petitioner's experts.

### b. Petitioner's Contentions Based on the Expert Testimony

Petitioner argues that because Eagle consistently applied a method of accounting that conforms with GAAP and clearly reflects income, respondent cannot require Eagle to change to another method of accounting. Petitioner points out that courts have said that the Commissioner cannot require a taxpayer to stop using an accounting method that clearly reflects income, even if another method might more clearly reflect income. Ford Motor Co. v. Commissioner, 71 F.3d 209, 213 (6th Cir. 1995), affg. 102 T.C. 87 (1994); Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 371 (1995). Petitioner also cites section 1.446-1(a)(2), Income Tax Regs., which states:

> A method of accounting which reflects the consistent application of generally accepted accounting principles . . . will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year.

Petitioner's reliance on that regulation is misplaced. An accounting method that conforms with GAAP does not necessarily clearly reflect income for tax purposes because tax and financial accounting have different objectives; "a presumptive equivalency between tax and financial accounting would create insurmountable difficulties of tax administration." Thor Power Tool Co. v. Commissioner, 439 U.S. at 540-544; see American Auto. Association v. United States, 367 U.S. at 693 (accounting that accords with generally accepted accounting principles is not necessarily binding on the Treasury). In Schlude v. Commissioner, 372 U.S. at 134, the Supreme Court held that a method of accounting similar to petitioner's method did not clearly reflect income despite unrebutted expert testimony that the taxpayer's method clearly reflected income under financial accounting principles and that those principles were followed. This case is indistinguishable from Schlude, American Auto. Association, and S. Garber, Inc. v. Commissioner, 51 T.C. 733 (1969).

As in Schlude and American Auto. Association, petitioner does not prevail despite petitioner's experts' conclusions about petitioner's accounting method. Thus, for the reasons stated in paragraph II-B, above, Eagle may not defer reporting customer deposits in income in the year it received them unless it qualifies under section 1.451-5, Income Tax Regs., discussed next.

C.   Whether Petitioner May Defer Reporting of Deposits Under
     Section 1.451-5, Income Tax Regs.

     1.   Relief Provisions for Accrual Basis Taxpayers

In 1971, the Commissioner issued Rev. Proc. 71-21, 1971-2 C.B. 549, relating to accrual basis taxpayers that receive advance payments for services, Rev. Proc. 71-21, sec. 1, and the Secretary issued section 1.451-5, Income Tax Regs., relating to accrual basis taxpayers that receive advance payments for the sale of property which they build, construct, install, or manufacture.  Section 1.451-5, Income Tax Regs., provides relief from Schlude v. Commissioner, supra; American Auto. Association v. United States, supra; Automobile Club of Michigan v. Commissioner, 353 U.S. 180 (1957); and Hagen Adver. Displays, Inc. v. Commissioner, 407 F.2d 1105 (6th Cir. 1969), affg. 47 T.C. 139 (1966).

     2.   Section 1.451-5, Income Tax Regs.

Petitioner contends that Eagle properly treated some of its customer deposits as advance payments under section 1.451-5, Income Tax Regs.

Under section 1.451-5, Income Tax Regs., accrual basis taxpayers that receive advance payments (e.g., customer deposits) in one taxable year may, in certain circumstances, defer reporting the payments in gross income.[6]  An advance payment is a

---

[6] Sec. 1.451-5, Income Tax Regs., was adopted Mar. 23, 1971. T.D. 7103, 1971-1 C.B. 138.  The regulation was promulgated in
                                        (continued...)

payment which is to be applied to a contract not completed during the taxable year. Sec. 1.451-5(a), Income Tax Regs.[7] Advance payments are includable in income in the taxable year in which the gross receipts from the contract are properly includable under the taxpayer's method of accounting. Sec. 1.451-5(b), Income Tax Regs.[8]

---

[6](...continued)
response to Hagen Advertising Displays, Inc. v. Commissioner, 407 F.2d 1105 (6th Cir. 1969), affg. 47 T.C. 139 (1966), which held that advance payments on the sale of goods were taxable in the year received. Gas Light Co. v. Commissioner, T.C. Memo. 1986-118.

[7] Sec. 1.451-5(a), Income Tax Regs., provides, in relevant part, as follows:

§ 1.451-5. Advance payments for goods and long-term contracts.--(a) Advance payment defined. (1) For purposes of this section, the term "advance payment" means any amount which is received in a taxable year by a taxpayer using an accrual method of accounting for purchases and sales or a long-term contract method of accounting * * * pursuant to, and to be applied against, an agreement:

(i) For the sale or other disposition in a future taxable year of goods held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or

(ii) For the building, installing, constructing or manufacturing by the taxpayer of items where the agreement is not completed within such taxable year.

[8] Sec. 1.451-5(b)(1), Income Tax Regs., provides, in relevant part, as follows:

(b) Taxable year of inclusion.--(1) In general. Advance payments must be included in income either --

(i) In the taxable year of receipt; or

(ii) Except as provided * * * [for inventoriable goods].

(continued...)

An accrual method taxpayer may defer income on advance payments received for (a) the sale in a future taxable year of goods held by the taxpayer primarily for sale to customers in the ordinary course of business; or (b) the building, installing, constructing, or manufacturing by the taxpayer of items where the agreement is not completed within the taxable year. Sec. 1.451-5(a), Income Tax Regs.

Respondent contends that petitioner may not use section 1.451-5, Income Tax Regs., because Eagle did not hold the house kits for sale to customers, or build, construct, install, or manufacture the kits as required by section 1.451-5(a)(1), Income Tax Regs.

3.    Whether Eagle Held the House Kits Primarily for Sale to Customers in the Ordinary Course of Business

Respondent contends that Eagle did not hold the house kits for sale to customers; i.e., Eagle had no inventory. Petitioner contends that it need not own or possess the inventory if its

---

[8](...continued)

(a) In the taxable year in which properly accruable under the taxpayer's method of accounting for tax purposes if such method results in including advance payments in gross receipts no later than the time such advance payments are included in gross receipts for purposes of all of his reports (including consolidated financial statements) to shareholders, partners, beneficiaries, other proprietors, and for credit purposes, or

(b) If the taxpayer's method of accounting for purposes of such reports results in advance payments (or any portion of such payments) being included in gross receipts earlier than for tax purposes, in the taxable year in which includible in gross receipts pursuant to his method of accounting for purposes of such reports.

supplier (i.e., Timberline) holds the goods, relying on Gas Light Co. v. Commissioner, T.C. Memo. 1986-118.  Petitioner argues that the house kits sold by Eagle were held by the taxpayer as required by section 1.451-5(a)(1)(i), Income Tax Regs., even though they were manufactured by Timberline and shipped directly to Eagle's customers.

We disagree.  In Gas Light Co. v. Commissioner, supra, we held that, under section 1.451-5(a), Income Tax Regs., security deposits received by a utility company were advance payments relating to inventoriable goods.  In that case, the taxpayer contended that it never had in its inventory natural gas which was transmitted by pipeline.  We rejected that contention; we said that natural gas transmitted through pipelines becomes inventory when it enters the pipeline, relying on Northern Natural Gas Co. v. Commissioner, 44 T.C. 74, 77-79 (1965), affd. 362 F.2d 781 (8th Cir. 1966), in which the taxpayer admitted that it owned pipeline gas and was required to use inventories in computing income.  Here, it is undisputed that Eagle did not at any time own or have title to the house kits; Timberline did. Thus, unlike the taxpayer in Gas Light Co. v. Commissioner, supra, Eagle had no inventory.

We conclude that the payments at issue were not advance payments under section 1.451-5(a)(1)(i), Income Tax Regs., because Eagle did not hold the house kits primarily for sale to customers in the ordinary course of business.

4.  <u>Whether the Purchase Agreements Were for Building,
    Installing, Constructing, or Manufacturing of Items by
    Eagle</u>

Respondent contends that the payments at issue are not
advance payments under section 1.451-5(a)(1)(ii), Income Tax
Regs., because Eagle did not build, install, construct, or
manufacture the house kits; Timberline did.  Petitioner contends
that Eagle need not be the manufacturer for the payments to
qualify under the regulation.  Petitioner points out that Eagle's
subcontractor, generally Timberline, manufactured the house kits
at Eagle's direction.  Petitioner also points out that Eagle's
engineers provided design services and produced the blueprints
for the house kits.  Petitioner cites no credible authority or
argument to support his contention that Eagle need not be a
manufacturer to qualify under section 1.451-5, Income Tax Regs.

Petitioner points out that we held that a taxpayer qualifies
under Rev. Proc. 71-21, 1971-2 C.B. 549, for deferral of income
from services in a case in which the services were performed by
subsidiaries instead of the taxpayer.  <u>Barnett Banks, Inc. v.
Commissioner</u>, 106 T.C. 103, 104-105, 116-117 (1996).  However,
there is no indication that the parties in that case raised or
that the Court considered the fact that the services were
performed by subsidiaries.

Petitioner contends that Eagle is a contractor and qualifies
under section 1.451-5, Income Tax Regs.  We disagree.  To qualify
under that regulation, the taxpayer must build, construct,

install, or manufacture property. Eagle did none of those things.

Before the Secretary promulgated section 1.451-5, Income Tax Regs., accrual basis taxpayers had to defer the deduction of inventoriable costs until they sold the goods. As discussed above, Eagle had no inventory. Eagle's situation is not like the categories of businesses eligible under section 1.451-5, Income Tax Regs., which do have inventoriable costs. 1 Alkire, Tax Accounting, par. 4.02[2], at 4-35 n.86 (1996).

We conclude that Eagle does not qualify under section 1.451-5(a)(1)(ii), Income Tax Regs., because it did not build, construct, install, or manufacture the house kits.

5. Reporting of Deposits--Conclusion

We hold that Eagle may not defer reporting of customer deposits under section 1.451-5, Income Tax Regs.[9]

D. Whether the Notice of Deficiency Complies With Section 7522

Petitioner contends that the notice of deficiency in this case did not describe the basis for the amounts of tax due as required by section 7522(a) and that, as a sanction, respondent should bear the burden of proving that Eagle may not defer

---

[9] Respondent contends that Eagle may not use sec. 1.451-5, Income Tax Regs., because (a) the purchase agreements were not for the sale of goods in a future taxable year as required by sec. 1.451-5(a)(1), Income Tax Regs., and (b) Eagle did not attach an information schedule to its returns as required by sec. 1.451-5(d), Income Tax Regs. In light of our conclusion in par. II-C, we need not decide those issues.

reporting its deposits in income under section 1.451-5, Income Tax Regs. Respondent concedes that shifting the burden of proof may be proper where the notice of deficiency violates section 7522, but contends that there was no violation here.

We need not decide whether to shift the burden of proof to respondent under section 7522 because respondent prevails on the deposits issue regardless of which party bears the burden of proof.

E.  Modification of the 30-Day Letter by the Revenue Agent

Respondent's revenue agent added to the 30-day letter a column with figures comparing Eagle's return with the results of the audit for 1992. Respondent's counsel did not know that the revenue agent had changed it and gave it to the Court to include in the stipulation. The revenue agent initially testified that she had not made the change, but later testified that she had.

The parties agree that the Court should sanction respondent under these circumstances, but disagree about whether the appropriate sanction is to strike respondent's answer, as petitioner contends; to shift the burden of proof for tax year 1992, as respondent contends; or some other sanction.[10]

---

[10] Respondent's revenue agent testified that she mailed the 30-day letter to petitioner's "power of attorney". In view of the fact that the revenue agent testified incorrectly about whether she changed the report, had no records that she mailed it, and did not know to whom she sent it, and petitioner's counsel stated that he did not see it before 1996, we do not find her testimony on this point to be credible. Thus, we have found
(continued...)

1.   <u>Whether To Shift the Burden of Proof</u>

Respondent contends that the appropriate sanction for the revenue agent's conduct in this case is to shift the burden of proof to respondent for 1992.  We need not consider whether to shift the burden of proof because, as stated at paragraph II-D, above, shifting the burden of proof to respondent would not affect the result in this case.

2.   <u>Whether To Impose a Sanction on Respondent</u>

Respondent's agent's testimony was under oath.  See sec. 7456.  We do not know whether she knew that her initial denial that she had changed the 30-day letter was incorrect; but even if she did not know, we think she was not sufficiently mindful of her obligations to the Court and counsel in this case.  The effect of her conduct was to cause petitioner to incur additional litigation expenses.  As respondent concedes, the agent's conduct in the instant case warrants some sanction.

Striking respondent's answer, as petitioner requests, would be equivalent to defaulting respondent.  A court should consider whether less drastic sanctions are more appropriate before dismissing an action.  <u>Halaco Engg. Co. v. Costle</u>, 843 F.2d 376, 381 (9th Cir. 1988).

---

[10](...continued)
that petitioner did not receive a copy of the 30-day letter in 1993 or 1994.  See par. I-C.  Similarly, we do not accept respondent's agent's testimony about when she changed the 30-day letter.

Rule 1(a) directs Judges of this Court to prescribe an appropriate procedure in matters involving questions of practice and procedure for which there is no applicable rule of procedure. Ash v. Commissioner, 96 T.C. 459, 469-470 (1991). Under appropriate circumstances, we may impose sanctions that are designed to mitigate the effects of misconduct by one party. See Rules 104(c), 123; Betz v. Commissioner, 90 T.C. 816, 823-824 (1988) (as a sanction for the Commissioner's failure to timely file an answer, we deemed established that the Commissioner erred in determining that additional interest was due under section 6621(c)); Vermouth v. Commissioner, 88 T.C. 1488, 1499 (1987) (Commissioner not permitted to introduce evidence of fraud because of failure to timely file an answer); see also Chambers v. NASCO, 501 U.S. 32 (1991) (District Court properly invoked its inherent power in assessing as a sanction for the plaintiff's bad faith conduct the attorney's fees and related expenses paid by the defendant).

Petitioner contends that respondent changed the 30-day letter to match it to the 3 years in the notice of deficiency and submitted it to support respondent's position that the notice of deficiency described the basis for the tax due as required by section 7522. Whether or not the agent had that purpose, the change did not have that effect because respondent conceded that the contents of the 30-day letter have no bearing on whether the notice of deficiency described the basis for the tax due as

required by section 7522.  However, respondent's counsel did not concede this point until late during the second of two hearings we held relating to the document.  Thus, it was fully appropriate for petitioner's counsel to pursue this matter.  It was unfair to add that burden to petitioner's normal presentation in this case.

However, we do not believe that petitioner was prejudiced in presenting the merits of this case by the addition of the 1992 column to the 30-day letter, its submission to petitioner to include in the stipulation, or the revenue agent's incorrect testimony.  Striking respondent's answer would be excessive under these circumstances.  Betz v. Commissioner, supra at 822-823.  Instead, we impose a sanction on respondent in favor of petitioner, in the amount of $5,000.

Decision will be entered

under Rule 155.